Good afternoon. My name is Matthew Harris and I'm the attorney representing Fatmata Qaeda in her appeal before this court. There were three issues brought up by Ms. Qaeda. The first was the I.G.A. made a negative credibility finding. And our point is that the I.G.A. did not have it. The good news for you is this is pre, you know, pre-2005. So, you know, under the new act, you have, you don't have to necessarily go to the heart of the claim. But some of the things she says, the dates are just so far off. Can you give me some explanation as to why? Two things. First, the amount of time that's gone by since the occurrence of the events. And the second is that given the how chaotic events were in Sierra Leone during that time. For example, she said when she came to the United States, she gave different dates and they were like not one, not two, not six months off. And happened back, the dates were just not even close to being consistent. Well, there was some consistency there in terms of the context of what she was saying. I don't think they added up. Was there any explanation for why? Nothing beyond the fact that the times were so chaotic and that she didn't remember them. Well, what I don't understand about the dates is the incident happened in 99. The incidents happened in 99. And she didn't leave Sierra Leone until 02. And we go to Guinea. And I don't really understand that. If these events were so horrible that it made survival, safe survival, in Sierra Leone untenable, then I would have thought that she had a way to get to Guinea because she got to Guinea. And her kids are in Guinea now even. Does she offer any explanation for that? I didn't see any. I want to make sure we get the dates right. The last incident of persecution was December 26, 2002. And then she left for Guinea not so long after that. And the detention, wasn't that in the 19 months, wasn't that in 99? 19 days. Yes, but there was also an incident in 2002. Yeah, but why didn't she leave right away in 99? I mean, if this was as horrific as it obviously was, then I can't understand her remaining in Sierra Leone when the party in power was not her party. Now the president is the president of her party. I think one of the reasons that she didn't leave during those times is that the RUF rebels. Now what did she say she didn't, why did she say she didn't leave then? Not your explanation, but her explanation. I can't point to something in the transcript at this point. Well doesn't that go to her credit, the credibility of her claim with respect to the problems in Sierra Leone? I'm not sure it's dispositive. I didn't say it was dispositive, I said doesn't that go to, doesn't that at least have an impact? I think it does. And also, do you see that point? Yes. And what kind of corroboration did she provide? Did she provide any hospitalization records? She was in the hospital. Leave aside the problem of the dates, because it seems to me that if you've been gang raped, you may not be in a position where you're going to know or remember dates. So I personally, I don't know about my panel, I'm not terribly, I am not concerned about that. But did she provide anything to show that she was in the hospital? No, she didn't have any corroboration of that. I think that's because things are so chaotic in that country, those kind of records aren't available. All right, then I have a basic question going to both of you. Neither of you discussed the country reports. Nobody mentioned the country reports. I got the country reports from the internet, because you can get country reports from the internet. How can people, I don't have a government and I don't know how you can make an argument with respect to conditions in Sierra Leone without getting the country reports. The country reports were in the administrative record. You don't discuss them in your brief? No, I don't cite them, that's true. Do the country reports. I mean, if there's a change of administration and it is now a party that's more favorable, wouldn't that cut against you? I think it would cut against us. And the president is the president of the party, the current president, that she supported. One of my points in the brief was that if this court decides that the testimony was credible, then the court, this court should grant withholding or protection under cap. I want to retreat from that because I think that's not the law. We don't decide whether the testimony was credible. We're not the finders of fact. That wasn't my point. My point was it has to go back to the IJ. You would not be expected to decide whether or not, if it was credible, we should get withholding. My point is that, I'm not sure we could argue here, the country conditions. That would be for the IJ to decide. No, but the point is, I think Justice Lillard's point is, they are a factor that weighs in. Maybe it's more, in this case, more in favor of the government. One additional question, just to add on to some of the concerns that we have. Why did she leave her children in Africa? How old are they? They're various ages. Young, 10 and under. How many are back in Africa now? I think they're all there. They're all in Guinea. Yes. Not in Sierra Leone. No, in Guinea. With her husband's family. Your question was why she didn't bring them with her? Yes, sir. I think it's just extremely difficult for her to come, let alone come up with the money and so on, and the papers for four additional people. She didn't have, she didn't come with her passport. Well, that's another question. I'm sorry. Go ahead. Well, she apparently got a passport. Yes. But she came on somebody else's passport, which she then sent back to Sierra Leone? Yes. Can you explain that? I mean, why didn't she come on her own passport? I think she was afraid that she couldn't get a visa. She just wanted to leave. Why? It'll be easier to get a visa on somebody else's passport? I think what happens in situations like this is it's possible to buy a passport and a visa and use that. I think she would have had to deal with the authorities in Sierra Leone in order to get proper travel documents, and I think that was not possible. She went from Sierra Leone to Guinea, correct? Yes. You say her husband's in Guinea? No, he's dead. He's dead. Well, he's disappeared. Her children are in Guinea? Yes. And her husband's family is taking care of them? Is that what you're saying? Yes. And why did she stay in Guinea? Was she being persecuted in Guinea? Yeah, close to persecution. The Guinean government decided that they didn't want the refugees from Sierra Leone in the country anymore, and there was a lot of agitation against them, and a lot of refugees from Sierra Leone left Guinea at that time for that reason. And I'm sorry, I don't have a cite for that, but she does talk about that in the trash. What about the due process issue? I'm sorry, the due process issue? Yes, it's a totally separate issue than what we've been talking about, but I think the IJ found that her testimony was not credible, largely because she considered it vague, and there was a lot of gaps in the record, and so on. And I think this is an extreme case of the IJ cutting off her testimony every time. He clearly did. Yes. She clearly did. The IJ was a she. Yes, I'm sorry. Yeah, she clearly did. There are many instances of that. The country report says that in 2002, the devastating 11-year civil conflict officially ended, and the government, backed by a United Nations peacekeeping force, asserted control over the whole country. Now, if that happened, well, we have to assume it happened, then it doesn't seem that that was a time for her to try to come to this country, after Sierra Leone settled down. The argument there is that things were not as peaceful as that quote would suggest, and there's other information which suggests that the rebels held out for a long time in pockets of the country. Well, I know. That brings me to my next question, which is, you rely now on Kat, on the Kat. Yes. Except, is there any evidence that these RUF people were connected with the government, and if not, then whatever her persecution was, didn't stem from the government. And Kat is directed to torture by the government. And anyway, well, I guess let's say, maybe we can say gang rape is torture. It would be. There's so many gaps in this case. How do you answer those questions? There's so many gaps in this case, so many problems with her position. There are significant problems. I think a lot of the problems could have come out had her attorney been able to do a proper direct, but she wasn't. A lot of the facts that he was trying to bring out were cut off. For instance, when he wanted to talk about the political situation in Sierra Leone, to establish why she would be persecuted, the IJ said, go on, I don't want to hear that. Well, yeah, but that's the other question. I got so many questions. That's the other question. Why is there in the record to show that she was taken by the RUF because of her political views? I think that is not on the record, because she wasn't able to develop that. Those questions were asked, she was cut off. I can cite to the point. Cite us where that particular question was cut off. Okay. This is, on the brief, it's page 19, the second paragraph. Where in the transcript? It's 110. Okay. In other words, the attorney is trying to ask her questions about the political thing and how they relate to her political opinion. And her attorney gets cut off there. Wait a minute. No. Then later on, the judge said, I'd like to find out why she left and why she's here. So then the question, why did you leave Sierra Leone? I left Sierra Leone because of severity of the death. So that looks like that was something that she was able to develop. I think the question before that is quite an issue. What type of government do you have in Sierra Leone? And that's when she cut her off. She said, I'd like to find out why she left and why she's here. I don't think there's anything wrong with that question. Well, I don't think there's anything wrong with the question. But she wasn't allowed to answer the first question, which was starting to talk about both the politics there and why she would have been persecuted for her politics, which is certainly a legitimate question. One of the things you might consider a gap if there's no connection between what happened to her and her politics. According to your position and maybe her testimony, she was not the only woman who had been taken by the RUF to wash clothes, to clean, cook, and for great purposes. Is there any evidence that the other – does she ever say that the others were taken for political purposes? No, as far as I know, that question was not asked. Yeah, well, Matt, but you have to – your counsel, Matt, not you, had to develop the case. So what we have is the RUF taking women off the street. She said she was going to get food. She was just taken – we do read the record. She was taken and she was put with all these other women who had to do the same things. It's very hard to conclude that only she was taken for political purposes and therefore because of her political opinion. She says at one point they knew that I was in favor of the deposed people, but then it would have assumed that everybody else was, and there's nothing to show that. On page 116, she gets caught from that line of direct. The counsel asks her why she was being mistreated, and the IJA directed, counsel, I'd like to find out what happened after this. They were cutting off the details. In other words, the IJA was saying, I don't want the background. I'd go on with what actually happened. And given that, she's not going to be able to establish why she was being persecuted. Do you have more questions? No. Your red light is on. Okay. You saved time. Yes, I did. Okay. We'll hear from the government. Thank you, the court. Ada Bosk on behalf of the Attorney General. This case is about adverse credibility. An asylum officer, an immigration judge, and the board each found Ms. Katia incredible, and that's why neither of the briefs probably addressed the merits of her persecution claim. The immigration judge was as impolite. I mean, he just constantly cut her off from the testimony. I don't think I've ever seen the transcript when you have a district judge or an IJA to have done what he did, what she did. Here, can you justify that? First, the discrepancies in her testimony, which there are significant grunt-wise. This is due process. Before you get to the discrepancies in the testimony, I mean, she kept saying, I counted, I don't know, eight, nine times where she said she had a hearing at 10.30 that morning. And hurry up. Hurry up. And toward the end, I mean, there was stuff here where she was saying, OK. OK, so she bled to death. Let's move on. I mean, that's pretty nasty. Well, if I could make several points. First, the petitioner here hasn't really made a due process argument. They argued the immigration judge impeded her testimony in terms of the adverse credibility. That's the same thing as making a due process argument, isn't it? We don't think so, no. Because the board would look at different things if it was a true due process argument. If you're saying your testimony was impeded, that means you weren't given the process that you thought was due, I would think. Well, what she argued to the board was that the reason why she was found incredible was because of the way the immigration judge handled the hearing. And if you look at the things that the board found as discrepancies, and I'll address those after I answer the court's question, they don't actually relate to any of these areas. Do you agree that the immigration judge kept cutting her off? No, not in the way that the court is looking at it. If you look at what the immigration judge did, she consistently asked counsel to specify what happened to the petitioner. And that's a completely appropriate thing to do. Immigration judges have broad discretion in how they handle immigration hearings. And the purpose of the immigration hearing is for the alien to tell their story. And to do that, they have to focus on what happened to them. I mean, there was a number of places where she was trying to tell her story. I mean, just at the end, could I just cover one more area? I'm sorry, just a couple more. Counsel, it's 10.30. We've done nothing here. Come on, let's finish this up. Just a couple more questions. No, not a couple more questions. Wrap it up. That's the tone throughout. Well, let me address that specifically and then make a more general statement. That is an exchange there. But if the court looks, the questioning continues. And then for at least three other times, the immigration judge, and those are at AR 134, 136, and 139, the immigration judge asks counsel whether there's anything else. And at that point, he responds, no. There were no objections raised during the hearing. There was no profit or what additional testimony would have been provided because the alien did testify on al-Qaeda consistently to what had occurred to her in Sierra Leone. I think Judge Pollack is... I think the question is coming in. I'll gather. We know him well enough. I'm not persuaded that the judge was a model of... orderly precedence in the way of presiding. But I think the point has been made by my colleagues' questions. What I'm... As I understand what you were starting to argue, it was that we have findings with respect to a lack of credibility by the IJ and sustained by the BIA. And that I find at least something that I'd like to pursue with you. The BIA spends a long paragraph sustaining the immigration judge's adverse credibility finding. It's sufficiently supported by the record. There is... And in the BIA's recital, it identifies one discrepancy which it characterizes as a significant discrepancy. And yet I'm not sure that the BIA wasn't simply wrong. It says... Her application quotes does not indicate that either the respondent or her children were caught or harmed during the 1997 incident. Yet the respondent testified in contrast that both she and her children were beaten and tortured during this incident, though no specifics were given. We find this to be a significant discrepancy. I'm... I wonder if the BIA simply didn't ignore the fact that there was a supplementary I-589 filed by a petitioner which said that after the rebels seized our food and valuables, the commander ordered the other rebels to beat us and to set the house on fire. The rebels beat us, set our house on fire, and then left. I don't know where that leaves the BIA's significant discrepancy. Well, there is a significant discrepancy. And as I said, there are three things, three reasons why the board and the immigration judge found Ms. Katia incredible. And one was her inability to recall when certain things happened that were of significance. The second is what the court is looking at. And that is that her story, each time she told it, changed. And it changed in material ways. When she was first interviewed by an asylum officer, she said that her husband disappeared and that she saw from a neighbor told her that her house had been set on fire. That changed when she submitted her asylum application. And then it became, as the court has noted, that the rebels came in, she was taken out of the house, her house was burned down, and she was beaten. When she testified, she added an additional fact, and that is not just that they were beaten, because she did say that, she also said that they were tortured, which is a significant omission from the two preceding statements that she gave. The other two bases for the board's finding that she was not incredible were the inability to recall when significant events occurred. What events? Excuse me. Do you want to ask the same question? I went through, we went through it, and it didn't seem to me that there was that much discrepancy. What events could she not recall that you say are significant? Well, let me preface my answer by saying it's not necessarily whether this court would agree, or whether a different immigration judge or board would comment on the decision. No, no, but that's a fact. The fact is, I think you just said that she couldn't recall significant dates, and I'd like to ask you, what significant dates could she not recall? Well, what she was unable to recall when her husband went missing, her house was set on fire, she was allegedly beaten. That is the first reason that the board gave for finding, among two other reasons for finding Ms. Katia incredible, and that such a significant event, the courts have consistently recognized that is an appropriate basis for an adverse credibility determination when somebody cannot recall something as huge as what Ms. Katia maintained occurred. My concern is that when the board calls something a significant discrepancy, and it turns out on inspection that there isn't a discrepancy, then that puts something of a pull on the BIA's opinion. Well, no, no, we believe that the discrepancies are significant. The evolution of her statements is a... It's what the BIA believes, not, with all respect, what the government believes. Well, and that's what I'm saying, it's what the board found, and Ms. Katia hasn't pointed to anything that compels a different conclusion than that. Although she couldn't remember the exact date when she was in the hospital, she did testify that by January 25th, 1999, she was out of pain and was at the hospital. So, was there anything about that date that would warrant a finding that she couldn't remember significant dates? The board looked at the testimony as a whole. It didn't point to aspects of it. Well, yeah, but we have to look at the specifics and see if we can support what the board said. She said she spent five years in total at her brother-in-law's house before deciding to go to Guinea. That apparently included the time before the attack and after, and that would have made sense given that she left Bowtown in 1997 and left Freetown in 2002. There's five years there. So, again, I don't really see, maybe I think Judge Pollack asked the same question, where are the significant, which are the significant dates that support the board's finding that she couldn't recall significant dates? If the court looks at the board's decision, they're laid out there, but I'll say them as well. Well, then you tell us. The 1997, when in 1997 her husband went missing, her house was burned down, her beat. Significant events that she could not recall when they occurred. When you mean when? You mean like the month, the year? I mean, it's really, she said she couldn't remember when her husband disappeared in 1997 because she was too traumatized, and there were many attacks in Bowtown by members of rebel forces of the RUF. So, what date do you think she should have been able to say? September 5, 1997? Well, interestingly enough, one of the affidavits that she submitted, and not on this issue, but she submitted an affidavit in support of when she came to the United States. There, that affidavit specifies a date. Well, let's get back to 1997, though, because you said that was the date, and I'm asking you what date should she have remembered? The rebels are there. We know from the country reports it was pretty traumatic there at that time. She knew it was 1997. She said the rebels tortured her and beat her and set fire to their house. She knew the year, what date should she have marked it on her calendar? No, Your Honor, but again, this is a significant event that she should remember vividly, and if the court looks at the affidavit that was submitted for purposes of showing when she arrived at the United States, the affiant there, who is not her, it's a third person, they provide a specific date. Well, but that was closer to the event. No. I mean, yeah, it is closer. I mean, if she's asked in 1992 or whenever she was questioned what happened the date in 1997, that's farther away than the date that she arrived in the country. She actually could remember. It's probably on a passport or a visa. But let me restate, because I'm not sure that the court is understanding my point. And there's another date discrepancy that I want to address as well. But her testimony was in 2005. In support of her application, she submitted an affidavit. But the crux of that affidavit involves when she entered the United States. But in that affidavit, there's an allegation as to when various things occurred in 1997. So suggesting that somebody, a third person, can recall a specific date when something happened. Did it have a specific date in the affidavit as to when these things happened in 1997? Yes. What date was that? April 15th. And yet she was unable to testify to that. The other date discrepancy, which the plaintiff put. Well, your friend on the other side said, well, we didn't have a date, so they put in a date. Did I misread that? I didn't hear that. But that would be. I didn't hear that? I didn't hear that. They're supposed to. They swear to the accuracy of the evidence that they're submitting. The second date issue. One thing is, do these inconsistencies go to the heart of her claim? Yes, Your Honor. Because? Because they each relate to the reasons why she alleged she was persecuted. I mean, she allegedly fled her hometown because of this attack that occurred. And she could not recall her testimony as to what occurred was inconsistent, and she could not recall when it happened. The other event the court started talking about during the initial quest argument was the event in 2002. She alleged that she, at various times, she alleged that something happened in December of 2002, as counsel noted earlier. She testified that she left Sierra Leone in February of 2002. When the immigration judge asked her to explain that inconsistency, she said she left in October of 2002, which only adds, really, to the discrepancy. Wasn't there a problem with the translator in this case? I got the impression from reading that there was a major problem, that the IJ thought the translator was not really, was doing other things, was dancing, was acting, playing theater. I mean, do we have any suggestion that the translator was an accurate translator? They have not alleged otherwise, Your Honor. There has been no question that the translator was translating the testimony accurately. And Ms. Cossack corrected her at various points when she, I recall one instance where she had said August and she meant October or vice versa. So at the time of the hearing, it was clear that Ms. Cossack understood what the translator was saying and was able to correct her when she said something inaccurate. The fact that the February 2002 date was actually a rendition of her saying the two months, 29th. But still February 29th. Yes, that's February if two months is what she really said and she could have easily, if we think maybe she meant the 12 months. She testified to the months consistently as numbers. And so when she testified to December, she used the word 12. When she testified about October, it was clear what she was testifying to, albeit she did it in numbers and not in months as we are normally accustomed to. But that wasn't the reason for the inconsistency. I mean, her testimony was inconsistent and she testified that certain things occurred at different times. Why didn't you, I'm sorry, are you on that line? No, I just, it's, the BIA made a point of the February 29th date as distinct from the December date. Of course, the December 29th date was one she gave repeatedly. And the BIA again says there's a significant discrepancy here. Well, one wonders. Quite apart from whether it's a crucial going to the heart of the testimony, that's a different issue. Again, her obligation is to show that the evidence is compelling to find that she's credible. But she was inconsistent. She testified at one point that it was December, at a different point that it was February, and a different point that it was October. And why it goes to the heart of her claim is because at least in her application, she said that there was an attack in December of 2002. And if she had left Sierra Leone before December of 2002, then she would not have been present at any such attack. She doesn't testify about the attack in her oral testimony, but that's a discrepancy between her oral testimony and her asylum application. There's no, if I can conclude really quickly. Sure. There's no presumption of credibility. So as the court noted, Ms. Kava didn't submit anything to corroborate her story. So every inconsistency weighed against a final credibility. I have a question. Why didn't you refer to the country reports? Again, because the immigration judge and the board found Ms. Kava incredible. They didn't reach the merits of her claim, and the country reports go to the merits of her claim. Don't the country reports go to whether she can be removed or not? We're talking about people with the IJ. In other words, you don't know what the decision is necessarily going to be when you introduce the country reports. I'm not sure I understood the question. When do you introduce the country reports? All the exhibits are in the beginning of the hearing. So before you knew anything else, why wouldn't you put the country reports in them? Because they appear to help you. They are in the record, as opposing counsel mentioned. They are in the administrative record, but because the finding here was that she was not credible, and I can tell the court what that is, they didn't reach the merits of it. So for those reasons and the reasons so far in our brief, we ask that the court sustain the decision of the board. Thank you. Thank you. In talking about the problems of the dates, the government just said or kept referring to them as inconsistencies. I don't think they were inconsistencies. They were inexact. And that's a big difference. Six months difference is not inexact. That's pretty significant. Why she can't be in the United States? Well, I think inexactness can be explained in a variety of ways. Isn't it your better argument that some of these things don't go to the heart of her claim? I would argue that also. Now that you have been prompted. I think the most important or my best argument here is the due process argument because the IJ mains credibility finding on the fact that there are large gaps both in time and kind of information they wanted to hear. And you brought up many questions of testimony that you would like to hear that wasn't there. And I can see that. That's true. There's a lot of information that I would like to see there but isn't. But because she was cut off so much, it's impossible to know what the real testimony would have been I think the IJ was impatient to say the least. But I'm not sure whether reading the entire transcript one can say that it represents a violation of due process, which is what we would have to do were we not to, were we to send it back. We can't affirm, we can't. And there was enough out there that she got across. So you can comment on that. And also, why shouldn't they send her back now? Because what is the obstacle to removing her now if she goes back to a country where the political party which she supports is in power? Our argument is that the RUF still has power in the country and is still harming people. Yeah, but that doesn't show in the country report. I mean, you've just got to say that. And even if the RUF is harming people, isn't that the same as what our opinions always say that street crime or something like that, the country reports suggest that there's, I guess, relative calm for that part of the world. I mean, there's not even relative calm in Philadelphia. Isn't that an important factor, that given whatever happened, there's no reason not to remove her now? She came illegally. I think it's a crucial argument, but I'm saying our argument would be that, by case law, it's not enough just to say that country conditions have improved. It's necessary to do an analysis of that. What about the country conditions improving makes it safe for her? Well, even the country report of Amnesty International for 2007, all of these are available online. There were trials of members of the RUF. They didn't get convicted, amazingly, but they didn't. It's really hard to know. It says UN Peacekeeping Office were replaced with a Peacebuilding Office. It doesn't. It's still one of the poorest countries in the world, but there were four political parties that campaigned ahead of the elections. I'm sorry, I didn't argue this in the brief, but I think if you read through the State Department country condition report, there's still a problem with rape in the country, and there are still some elements of the RUF existing. There's a problem with rape for women in Philadelphia. If you go into West Philadelphia or North Philadelphia or Southwest Philadelphia. And also it's not a case where the government is necessarily responsible for letting it happen and not doing anything about it. I mean, that's what you have to share. I think I would argue that it is something the good government has not been able to stop, which I think qualifies. Only if the government is turning a, in effect, willful blindness under sobering evil. I think you've said it correctly. To me, your best argument is due process. Okay. Thank you very much. Thank you. We'll take the matter under advisement.